UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NATIONAL ASSOCIATION OF
OPTOMETRISTS & OPTICIANS;
LENSCRAFTERS, INC; and EYE            NO. CIV. S-02-1464 LKK/DAD
CARE CENTERS OF AMERICA, INC.,

        Plaintiffs,

    v.                                          O R D E R

BILL LOCKYER, in his official
capacity as Attorney General          **TO BE PUBLISHED**
of the State of California; and
CHARLENE ZETTEL, in her official
capacity as Director of the
Department of Consumer Affairs,

        Defendants,
_____/

    Plaintiffs challenge the constitutionality of California"s

statutory scheme regulating the manner in which interstate

optical companies sell eyewear in California.  Plaintiffs are

the National Association of Optometrists and Opticians ("NAOO")

and two out-of-state optical companies, LensCrafters, Inc. and

Eye Care Centers of America, Inc. ("ECCA").  Both LensCrafters

1

and ECCA own numerous optical stores throughout the United States.  Defendants are the Attorney General of California and the Director of the California Department of Consumer Affairs, both sued in their official capacities.[1]  Plaintiffs seek a declaration that the challenged statutory and regulatory provisions violate the Commerce Clause, Equal Protection Clause, Due Process Clause and First Amendment of the United States Constitution, and seek to enjoin enforcement of the provisions on that basis.

Currently pending before the court are motions for summary judgment filed by plaintiffs and defendants.  These motions address the question of whether the challenged statutory scheme violates the dormant Commerce Clause.  These motions were originally filed in 2003; however, on March 10, 2004, the entire case was stayed pending resolution of <u>People v. Cole</u>, 38 Cal. 4th 964 (2006).[2]  On June 12, 2006, the California Supreme Court decided <u>Cole</u> and the stay in the pending case was lifted. Oral argument was heard on the pending motions prior to the stay and again on September 25, 2006.  The court decides the matter

---

[1]    The Department of Consumer Affairs has supervisory powers over the Board of Optometry, which has the power to discipline optometrists, and the Medical Board of California, which has the power to discipline opticians.

[2]    As explained in the Court's order staying the case, a decision in <u>Cole</u> favorable to the plaintiffs here may have eliminated or narrowed the necessity for a ruling on plaintiffs' federal constitutional claims.

1  based on the papers and after oral argument.[3]

2  **I.**

3  **UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND**[4]

4  **A.    The Challenged Laws**

5  Plaintiffs challenge three sections of California's

6  Business & Professions Code,§§ 655, 2556 and 3130, and two

7  companion regulations, 16 Cal. Code of Regs, Title 16 §§

8  1399.251 and 1514, to the extent these provisions taken together

9  prohibit out-of-state optical companies from offering

10 prescription eyewear at the same location in which eye

11 examinations are provided, and from advertising that eyewear and

12 eye examinations are available in the same location.

13 Section 655 prohibits an out-of-state optical company from

14 _____

15 [3]    Also pending before the court are motions to file amicus
   curiae briefs by the California Optometric Association and Melvin
   Gene Snow and Sabrina Hughes.   Plaintiffs filed an opposition to

16 both motions.  The court notes that the pending motions for summary
   judgment were filed in 2003 and several hearings have occurred in

17 the case.   The parties seeking to file amicus briefs fail to
   explain  why  they  waited  until  the  fall  of  2006  to  file  their

18 requests.  The requests to file amicus briefs simply come too late.
   See, e.g., Hawksbill Sea Turtle v. FEMA, 11 F. Supp. 2d 529, 541

19 (D.V.I. 1998) (denying leave to file amicus brief on grounds that
   the "information provided in the brief is untimely since it comes

20 almost two years after this action was commenced and several months
   after  the  parties  completed  briefing  their  Cross  Motions  for

21 Summary  Judgment."); O Centro Espirita Beneficiente Uniao Do
   Vegetal v. Ashcroft, 282 F. Supp. 2d 1271, 1274 (D.N.M. 2002)

22 (denying leave to file amicus brief where pending motions had been
   briefed for over one year and hearing had previously been held).

23 For these reasons, the requests to file amicus briefs are denied.

24

25 [4]    Undisputed  unless  otherwise  noted.  Both  parties  filed
   motions to strike certain evidence.  None of the evidence at issue
   in the motions to strike was relied upon by the court in reaching

26 its conclusion. Thus the motions are moot.

leasing space in its eyewear store to an optometrist.[5]  Section 2556 prohibits an out-of-state optical company from furnishing the services of an optometrist on or near its optical dispensing premises.  Section 2556 also prohibits non-optometrists from advertising the services of an optometrist.

**B.   Plaintiffs' Allegations**

Plaintiffs allege that optometrists and optical companies compete vigorously to sell eyewear in a national market.  They claim that the ability to sell eyewear at the same location in which eye examinations are performed provides a significant competitive advantage.  According to plaintiffs', consumers benefit from and prefer the provision of such "one-stop shopping" and patronize entities that can offer it.

Under California's statutory and regulatory scheme, in-state optometrists and ophthalmologists are permitted to sell eyewear in the same location in which eye examinations are performed, and to advertise that eyewear is sold in that manner. Plaintiffs allege that out-of-state optical companies are forbidden from competing for the same customers in the same way. Plaintiffs also allege that California's restrictive scheme harms the welfare and health of consumers, unjustly burdens plaintiffs, and provides no discernible countervailing benefits

---

[5]     Section 655 makes it unlawful for an optician or any company that manufactures or distributes eyewear to "have any membership, proprietary interest, co-ownership, landlord-tenant relationship, or any profit-sharing arrangement in any form, directly or indirectly," with an optometrist.  Cal. Bus. & Prof. Code § 655.

4

1   to the public.

2   **C.   The Retail Eyewear Market**

3        "Prescription eyewear" refers to corrective lenses and

4   frames for eyeglasses, manufactured according to a lens

5   prescription issued by either an optometrist or an

6   ophthalmologist.  Decl. of Roger Noll in Supp. of Pls.' Mot. for

7   Summ. J. re: Discriminatory Effect ("Noll Decl.") at ¶ 11.   In

8   California, an eye examination must be performed by an

9   optometrist, licensed by the California Board of Optometry, <u>see</u>

10  Cal. Bus. & Prof. Code §§ 3010, 3041.2, 3055, or by an

11  ophthalmologist, a medical doctor specializing in treating eye

12  disease, licensed by the Medical Board of California, <u>see</u> Cal.

13  Bus. & Prof. Code §§ 2003, 2050.  An optometrist or

14  ophthalmologist will write a lens prescription, which is then

15  used to manufacture lenses for frames (and/or contact lenses).

16  Noll Decl. at ¶ 12.

17       A consumer may purchase eyewear from among the following

18  professionals:

19       **1.   Dispensing Optometrists/Registered Dispensing**
             **Optometrists**
20

21       Many optometrists licenced in California sell eyewear as

    part of their services. Noll Decl. at ¶ 14.  They offer "one-
22
    stop shopping" in that a patient can get his or her eyes
23
    examined and purchase glasses in the same location.
24
         Defendants' expert, Lawrence Thal, O.D., former President
25
    of the California Optometric Association and former President of
26

the California Board of Optometry, estimates that over 90
percent of optometrists in private practice sell eyewear.  Dep.
of Lawrence Thal Vol. I ("Thal Dep. I") at 116:25-118:9,
129:13-15, Ex. 6 of Decl. of Lori Schechter in Supp. of Mot.
Pls.' for Summ. J. re: Discriminatory Effect ("Schechter Decl.
re: Discriminatory Effect"); Dep. of Lawrence Thal Vol. II
("Thal Dep. II") at 394:23-395:6, Ex. 7 of Schechter Decl. re:
Discriminatory Effect.  Such optometrists are referred to as
"dispensing" optometrists, or registered dispensing optometrists
("RDOs").

In 2001, dispensing optometrists accounted for
approximately 31 percent of optical retail sales nationwide.
Noll Decl. at ¶ 14.  Plaintiff's expert, Gary Ford, however,
explains that in California, this percentage is likely much
larger, as a recent California survey showed that 60 percent of
consumers last purchased their eyewear from a dispensing
optometrist.  Decl. of Gary T. Ford in Supp. of Pls.' Mot. for
Summ. J. re: Discriminatory Effect ("Ford Decl.") at ¶ 9.

Plaintiffs maintain that dispensing optometrists derive a
significant portion of their income from the sale of eyewear.
It is estimated that the percentage of gross income for
dispensing optometrists derived from the sale of eyewear exceeds
50 percent.  The percentage of net income is estimated at
approximately 25 percent.  Noll Decl. at ¶ 14; Dep. of Neil
Gailmard ("Gailmard Dep.") at 68:17-69:23, Ex. 8 of Schechter
Decl. re: Discriminatory Effect.

1         **2.  Interstate Optical Companies**

2       Interstate optical chains, such as LensCrafters and ECCA,

3 are the main competitors of dispensing optometrists in the sale

4 of prescription eyewear.  As plaintiffs point out, in 2001,

5 interstate optical chains accounted for approximately 40 percent

6 of optical retail sales nationwide.  Noll Decl. at ¶ 16.  A

7 recent survey showed that in California, 26 percent of consumers

8 made their last purchase of prescription eyewear from an

9 interstate retail chain.  Id. at ¶ 16; Ford Decl. at ¶ 10.

10 Prior to the California Supreme Court's decision in Cole,

11 explained in greater depth herein, interstate optical chains had

12 been selling eyewear while also associating with specialized

13 health care service plans licensed under the California

14 Knox-Keene Health Care Service Plan Act of 1975, Cal. Health &

15 Safety Code § 1340 et seq.  See, e.g., Dep. of Wallace W.

16 Lovejoy ("Lovejoy Dep.") at 23:16-22, Ex. 1 of Schechter Decl.

17 re: Discriminatory Effect.

18      The Knox-Keene plans are a type of HMO.  Under the

19 supervision of a state agency, the Department of Managed Health

20 Care ("DMHC"), Knox-Keene plans employ or contract with

21 optometrists and provide optometric services to plan members.

22 The interstate chains then lease space in their stores to

23 Knox-Keene plans that employ the optometrists.  Plaintiffs aver

24 that, in this way, interstate chains had been able to provide

25 one-stop shopping in competition with in-state dispensing

26 optometrists and ophthalmologists, albeit with added regulatory

1   and financial burdens.

2        These arrangements made pursuant to the Knox-Keene Act were

3   recently invalidated by the California Supreme Court in the Cole

4   case.  At issue in the case was the Attorney General's

5   contention that the co-location of an optical company, Pearle

6   Vision, with an affiliated Knox-Keene plan that employs

7   optometrists, violated two of the challenged restrictions,

8   specifically Business & Professions Code sections 655 and 2556,

9   and Code of Regulation section 1399.251.  Under the Attorney

10  General's interpretation, there was no circumstance under which

11  an interstate entity could offer one-stop shopping consistent

12  with the challenged restrictions.

13       In its recent opinion, the California Supreme Court

14  concluded that the Act does not exempt approved plans from the

15  restrictions imposed by sections 655 and 2556.  People v. Cole,

16  38 Cal. 4th 964, 969 (2006).  The court concluded that approved

17  plans are authorized to deliver professional services, not to

18  lease space.  Id. at 986.  "As a landlord, Pearle RDO simply is

19  not acting as a 'provider of professional services.'"  Id.

20  Without ruling on the question of whether or not the Pearle,

21  Inc. business arrangement does in fact violate sections 655 and

22  2556, the court held that the Knox-Keene Act did not exempt

23  optical companies from the restrictions set forth in sections

24  655 and 2556.  The practical effect of the Cole decision is that

25  optical companies may no longer compete in the California market

26  through arrangements pursuant to the Knox-Keene Act.

1        **3.    Independent Opticians**

2       Consumers may also purchase eyewear from independent

3 licensed opticians.  Cal. Bus. & Prof. Code §§ 2550, 2553; Noll

4 Decl. at ¶ 17.  These independent optical shops sell eyewear,

5 but do not affiliate with optometrists to make eye examinations

6 available at the same location.  Noll Decl. at ¶ 17.  In 2001,

7 independent opticians accounted for approximately 13.8 percent

8 of retail sales nationwide.  Id.  A 2003 California survey

9 showed only about 3.8 percent of consumers had made their last

10 purchase of prescription eyewear from independent opticians.

11 Ford Decl. at ¶ 12.  These independent opticians are a declining

12 part of the market.  Noll Decl. at ¶ 27.

13        **4.    Dispensing Ophthalmologists**

14       Finally, consumers may also purchase eyewear from

15 ophthalmologists.  In 2001, dispensing ophthalmologists

16 accounted for approximately 12.3 percent of optical retail sales

17 nationwide.  Noll Decl. at ¶ 15.

18 **D.    Consumer Demand for One-Stop Shopping**

19       Plaintiffs present uncontroverted evidence demonstrating

20 that the primary factor effecting competition in the retail

21 eyewear market is the overwhelming consumer preference for

22 one-stop shopping.  One-stop shopping has "become the dominant

23 form of retailing eyewear."  Noll Decl. at ¶ 27.  As the market

24 figures relating to California independent opticians show,

25 "stores that sell eyewear but do not offer [one-stop shopping]

26 are increasingly marginal competitors in the market."  Noll

1 Decl. at ¶ 27; Ford Decl. at ¶ 12; Lovejoy Dep. at 246:24-247:2.

2     Defendants concede that offering one-stop shopping provides

3 a competitive advantage because it is "easier to attract

4 business, make sales, and enjoy profits."  Defs.' Suppl. Resp.

5 to ECCA First Set of Interrogs., No. 6, Ex. 11 of Schechter

6 Decl. re: Discriminatory Effect.

7     Indeed, both defendants' and plaintiffs' experts state that

8 consumers prefer the convenience of one-stop shopping and make

9 their purchasing decisions accordingly.  Ford Decl. at ¶¶ 15,

10 16; Dep. of Frank Baynham ("Baynham Dep.") at 116:21-117:5;

11 135:23-136:21, Ex. 12 of Schechter Decl. re: Discriminatory

12 Effect; Lovejoy Dep. at 272:24-273:13; Defs.' Suppl. Resp. to

13 ECCA First Set of Interrogs., No. 8, Ex. 11 of Schechter Decl.

14 re: Discriminatory Effect.  Consumers also find it more

15 convenient to address any quality issues in one location,

16 without concern for determining whether it was the optician or

17 the optometrist that was responsible for the error.  Noll Decl.

18 ¶ 27.  Defendants' expert, Dr. Thal, agrees.  Thal Dep. I at

19 87:20-89:24, Ex. 6 of Schechter Decl. re: Discriminatory Effect

20 (The ability to return to only one place to correct an error is

21 "another benefit to the patient in being able to purchase their

22 eyewear at the same place where they had their eyes examined.").

23 **E.   Effect of the Challenged Restrictions on Ability of
Interstate Optical Chains to Offer One-Stop Shopping**

24

25     Section 655 prohibits an interstate optical company from

26 leasing space in its eyewear store to an optometrist.  Section

655 was introduced in the California Legislature in 1969 "on behalf of the California Optometric Association in an effort to protect California from some of the problems. . . being experienced in eastern states, where large business interests have completely taken over the optometric profession."  Letter from Senator Sherman, the legislation's chief sponsor, to Governor Reagan, dated August 11, 1969 ("Letter from Sen. Sherman to Gov. Reagan"), Ex. 13 of Schechter Decl. re: Discriminatory Effect; Dep. of Carolina Rose ("Rose Dep.") at 207:14-209:20, Ex. 14 of Schechter Decl. re: Discriminatory Effect; Defs.' Resp. to NAOO RFA No. 21, Ex. 18 of Schechter Decl. re: Discriminatory Effect.  In enacting Section 655, it was not the Legislature's "intention to harm any existing relationships between California optometrists" which were thus excluded "by a careful amendment."  See Letter from Sen. Sherman to Gov. Reagan, Ex. 13 of Schechter Decl. re: Discriminatory Effect.

Section 2556 prohibits an interstate optical company from furnishing the services of an optometrist, or from maintaining an optometrist "on or near the premises used for optical dispensing . . ." and from advertising that an optometrist is available where the eyewear is sold.  Cal. Bus. & Prof. Code § 2556.  Defendants' legislative analyst expert concedes that section 2556 was enacted as part of an effort to prevent out-of-state optical companies from coming into California and undercutting dispensing optometrists on price.  Rose Dep. at

1   173:15-174:18.  Section 1514 likewise prohibits an optical chain

2   from occupying rented space with an optometrist.  Sections 3130,

3   1514 and 1399.251 all prohibit optical chains from advertising

4   the availability of one-stop shopping at their locations.

5       California law does not impose analogous restrictions on

6   in-state dispensing optometrists or ophthalmologists; instead,

7   it leaves them free to sell eyewear and to advertise one-stop

8   shopping.  See, e.g., Cal. Bus. & Prof. Code § 2557.

9                                    **II.**

10                              **ANALYSIS** [6]

11  **A.   The Dormant Commerce Clause**

12      The Supreme Court has long interpreted the Commerce Clause

13  to have a "negative aspect," referred to as the dormant Commerce

14  Clause, "that denies the States the power unjustifiably to

15  discriminate against or burden the interstate flow of articles

16  of commerce."  Oregon Waste Sys., Inc. v. Dep't of Envtl.

17  Quality, 511 U.S. 93, 98 (1994).  The Court's dormant Commerce

18  Clause jurisprudence is forged from the tension between the

19  Constitution's twin commitments to national unity and local

20  autonomy.  See Conservation Force, Inc. v. Manning, 301 F.3d

21  985, 990 (9th Cir. 2002); see also H.P. Hood & Sons, Inc. v. Du

22  Mond, 336 U.S. 525, 533-34 (1949) (explaining that "[t]he desire

23  _____

24      [6]    The standards applicable to resolution of a motion for
    summary judgment are well known, and have been discussed at length
    by this court elsewhere.  See, e.g., Guru Nanak Sikh Society v.

25  County of Sutter, 326 F. Supp. 2d 1140, 1147 (E.D.Cal. 2003).  As
    a concession to both the shortness of life and the length of this

26  opinion, the court will not repeat that discussion.

                                    12

1   of the Forefathers to federalize regulation of foreign and

2   interstate commerce stands in sharp contrast to their jealous

3   preservation of [states'] power over their internal affairs").

4   The Court has "struggled (to put it nicely) to develop a set of

5   rules by which we may preserve a national market without

6   needlessly intruding upon the States' police powers, each

7   exercise of which no doubt has some effect on the commerce of

8   the Nation."  <u>Camps Newfound/Owatonna, Inc. v. Town of Harrison</u>,

9   520 U.S. 564, 596 (1997) (Scalia, J., dissenting).

10      The instant motions demonstrate the difficulty of

11  adjudicating between these tensions, pitting the State's power

12  to regulate health professions relating to eye care against the

13  federal interest in preserving a national market for eyewear

14  that is free from protectionist barriers to competition.  Given

15  this difficulty, the Supreme Court has cautioned that the

16  dormant Commerce Clause inquiry should be undertaken by

17  "eschew[ing] formalism for a sensitive, case-by-case analysis of

18  purposes and effects." <u>West Lynn Creamery, Inc. v. Healy</u>, 512

19  U.S. 186, 201 (1994).

20      Nonetheless, in order to determine whether the regulations

21  challenged in the case at bar implicate the dormant Commerce

22  Clause, the court must engage in a two-part analysis.  First,

23  the court must determine if the challenged laws discriminate

24  against interstate commerce.  Second, "[w]here discrimination

25  exists, the regulation is subject to strict scrutiny under which

26  it is the state's burden to show that the discrimination is

13

narrowly tailored to further a legitimate interest."
Conservation Force, 301 F.3d at 995 (internal citations and
quotation marks omitted).  If there is no discrimination and "if
the State regulates evenhandedly, the regulation is valid unless
the plaintiff can show that it imposes a burden on interstate
commerce clearly excessive in relation to the putative local
benefits." Id.

     The court first addresses the threshold question of whether
the challenged regulations discriminate against interstate
commerce.

**B.   Discriminatory Effect on Interstate Commerce**

     "Discrimination" for purposes of the Commerce Clause means
"differential treatment of in-state and out-of-state economic
interests that benefits the former and burdens the latter."
Oregon Waste Sys., 511 U.S. at 99.  A state law may discriminate
against interstate commerce in three ways, any one of which is
sufficient to trigger strict scrutiny.  A law may discriminate
(1) on its face, by explicitly treating local and out-of-state
interests differently; (2) in its purpose; (3) or in its effect,
by providing a competitive advantage to local interests.  See
SDDS, Inc. v. South Dakota, 47 F.3d 263, 267 (8th Cir. 1995).

     Defendants contend that the dormant Commerce Clause is
simply inapplicable because the challenged restrictions do not
effect interstate commerce.  This is so, they argue, because the
restrictions address purely local concerns and treat in-state
and out-of-state entities in the same manner.  While the latter

14

1  issue is really just another way of framing the discrimination
2  question, the former (whether the restrictions address purely
3  local concerns) must be addressed as a threshold matter.  Put
4  simply, if the challenged restrictions have no impact on
5  interstate commerce, the inquiry ends there.

6          1.    **Impact on Interstate Commerce**

7              a.    **The Lack of Facially Discriminatory Language**

8          Defendants' first argument in this regard may be easily
9  dispensed with.  They contend that the language of the
10 challenged statutes and regulations makes no reference to
11 interstate commerce or out-of-state companies.  This contention
12 while correct misses the point.  "Certainly, a facially neutral
13 statute may be discriminatory because of its effect."  <u>Ford</u>
14 <u>Motor Co. v. Texas Dep't of Transp.</u>, 264 F.3d 493, 500 (5th Cir.
15 2001); <u>see</u> <u>Minnesota v. Clover Leaf Creamery Company</u>, 449 U.S.
16 456, 471 n. 15 (1981) ("A court may find a state law constitutes
17 'economic protectionism' on proof of either discriminatory
18 effect, or of discriminatory purpose.").

19         While the language of a statute is certainly relevant to
20 determining how that statute achieves effects in the real world,
21 the absence of explicitly discriminatory language does not
22 necessarily indicate an absence of discrimination.  This is the
23 essence of the concept of "discriminatory effects," which has
24 been a feature of American constitutional law, not only in the
25 Commerce Clause context, but in many other contexts since the
26 landmark decision in <u>Yick Wo v. Hopkins</u>, 118 U.S. 356 (1886).

1        **b.   Effect on Flow of Goods and Services**

2        Defendants next argue that the challenged statutes and

3  regulations are unrelated to the flow of goods and services and

4  therefore have no effect on interstate commerce.  Nothing about

5  the challenged enactments, they argue, effects or prevents the

6  passage of interstate goods or services either into or out of

7  California; their subject matter is purely local activity.

8        The Supreme Court has addressed similar arguments and has

9  held that "[e]ven when business activities are purely local, if

10  'it is interstate commerce that feels the pinch, it does not

11  matter how local the operation which applies the squeeze.'"

12  Camps Newfound/Owatonna, Inc., 520 U.S. at 573 (quoting Heart of

13  Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258 (1964)).

14  Here, however, the activity being regulated – the operation of

15  interstate chains within California – is clearly not purely

16  local.  Momentarily setting aside the question of whether the

17  challenged restrictions are discriminatory or invalid, it is

18  nevertheless clear that this is a classic "market entry" case.

19        It is well-established that regulations which "prevent

20  competition in local markets by out-of-state firms" effect

21  interstate commerce just as much as laws regulating the free

22  flow of goods.  Lewis v. BT Inv. Managers, 447 U.S. 27, 39

23  (1980) (striking down statute which discriminated against

24  out-of-state entities' ownership of local investment or trust

25  businesses).

26        For instance, in C & A Carbone, Inc. v. Clarkstown, 511

1  U.S. 392, 391 (1994), the Supreme Court found that a local
2  ordinance requiring all solid waste to be processed at a
3  pre-designated local facility effected interstate commerce.
4  Carbone, 511 U.S. at 389.  The Court explained that "the article
5  of commerce is not so much the solid waste itself, but rather
6  the service of processing and disposing of it."  Id. at 391.
7  "The essential vice in laws of this sort is that they bar the
8  import of the processing service" and "leave[] no room for
9  investment from outside."  Id. at 392.  Consequently, the
10 dormant Commerce Clause was implicated because the ordinance
11 restricted the flow of services, and "deprive[d] out-of-state
12 businesses of access to a local market."  Id. at 389; see also
13 Camps Newfound/Ottawana, 520 U.S. at 577 n.10 ("We have long
14 noted the applicability of our dormant Commerce Clause
15 jurisprudence to service industries.");  Gulch Gaming, Inc. v.
16 South Dakota, 781 F. Supp. 621, 625 (D.S.D. 1991) (finding that
17 statute which "interferes with the flow of investments across
18 state lines . . . [and thus] restricts the opportunities of
19 nonresidents . . . to invest . . . in businesses owning South
20 Dakota gaming licenses" effects interstate commerce); John
21 Havlir & Assoc., Inc. v. TACOA, Inc., 810 F. Supp. 752, 756
22 (N.D. Tx. 1993) ("Statutes that impose burdens on out-of-state
23 businesses that are not applicable to in-state businesses effect
24 interstate commerce just as directly as those that regulate the
25 flow of goods across state lines.").
26       Similarly, and for the reasons discussed herein, the

17

1  relevant regulated activity in this case is not so much the flow

2  of eyewear itself, as it is the service of selling prescription

3  eyewear.

4          **c.   Professional Regulations & Commerce Clause**

5          Defendants appear to contend that state regulation of the

6  learned professions is necessarily purely local, or insulated in

7  some way from Commerce Clause challenge.  I cannot agree.

8          In <u>National Pharmacies, Inc. v. De Melecio</u>, 51 F. Supp.2d

9  45 (D.P.R. 1999), a dormant Commerce Clause challenge to Puerto

10 Rico's restrictions on the practice of pharmacy, the court

11 rejected a nearly identical argument by the government that the

12 "practice of pharmacy is a profession, not a part of commerce,

13 and Puerto Rico's regulation of pharmacists is therefore not

14 subject to the strictures of the dormant commerce clause." <u>Id.</u>

15 at 54.  The conclusion reached by the <u>National Pharmacies</u> court

16 – that there is no such exception for the profession – is just

17 as applicable here.

18         It is true that the states have broad powers to regulate

19 and license the practice of the professions, <u>Goldfarb v. Virginia</u>

20 <u>State Bar</u>, 421 U.S. 773, 792 (1975); <u>Goldfarb v. Supreme Court</u>

21 <u>of Virginia</u>, 766 F.2d 859, 862 (4th Cir. 1985), and that the

22 states' police powers indisputably provide authority for

23 legislation which protects the health and safety of their

24 citizens. <u>See</u> <u>Maine v. Taylor</u>, 477 U.S. 131, 151-52 (1986);

25 <u>Ferndale Laboratories v. Cavendish</u>, 79 F.3d 488, 495 (6th Cir.

26 1996).  It does not follow that the state is free from Commerce

Clause concerns. On the contrary, when a state legislates in an
area of legitimate local concern, it nevertheless is limited by
the Commerce Clause. <u>Minnesota v. Clover Leaf Creamery Co.</u>, 449
U.S. 456, 471 (1981). This limitation applies even for state
regulations regarding the health of its citizens. <u>See</u> <u>Kassel v.</u>
<u>Consol. Freightways</u>, 450 U.S. 662, 670 (1981) ("The incantation
of a purpose to promote the public health or safety does not
insulate a state law from Commerce Clause attack. Regulations
designed for that salutary purpose nevertheless may further the
purpose so marginally, and interfere with commerce so
substantially, as to be invalid under the Commerce Clause.");
<u>Hunt v. Washington State Apple Adver. Comm'n</u>, 432 U.S. 333, 350
(1977) ("[a] finding that state legislation furthers matters of
legitimate local concern, even in the health and consumer
protection areas, does not end the inquiry.").

That proposition applies with equal force in the case of
state laws that regulate professions. Courts have considered
whether state laws that regulate professions unconstitutionally
limit interstate commerce on numerous occasions, making clear
that there is no "professional regulation" exception to the
Constitution's dormant Commerce Clause requirements. <u>See</u>, <u>e.g.</u>,
<u>Head v. New Mexico Bd. of Exam'r in Optometry</u>, 374 U.S. 424,
428-29 (1963) (law prohibiting optometrists from mentioning
specific prices in their advertising); <u>Tolchin v. Sup. Ct. of</u>
<u>the State of New Jersey</u>, 111 F.3d 1099, 1106-11 (3rd Cir. 1997)
(requirements for the practice of law in state); <u>Kirkpatrick v.</u>

Shaw, 70 F.3d 100, 103 (11th Cir.1995) (rules for lawyers' admission to state bar); Tetra Technologies, Inc. v. Harter, 823 F.Supp. 1116, 1121-24 (S.D.N.Y. 1993) (law on licensing engineers); Ferndale, 79 F.3d at 492-96 (regulation of wholesale distributors of pharmaceuticals); K-S Pharmacies v. American Home Products, 962 F.2d 728, 730-32 (7th Cir. 1992) (statute forbidding price discrimination in wholesale transactions of prescription drugs).

Analogously, in the Sherman Act antitrust context, the professions are considered a part of interstate commerce. See Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 329- 33 (1991) (allegation that hospitals conspired to exclude a single physician from the market for ophthalmological services in Los Angeles was sufficient to establish a nexus to interstate commerce for purposes of antitrust jurisdiction); Goldfarb, 421 U.S. at 786-88 (in case involving a minimum legal fee schedule established by bar association, Court rejected argument that the learned professions were not a part of trade or interstate commerce); Boddicker v. Arizona State Dental Ass'n, 549 F.2d 626, 629-32 (9th Cir. 1977) (dental associations' membership requirements on individual dentists effected interstate commerce and these practices were not entitled to a "learned profession" exemption).

Because the challenged regulations implicate, and indeed effect, interstate commerce, the next step of the analysis is determining whether the regulations discriminate against

interstate commerce.

   **2.   Discriminatory Effect**

      **a.   Whether the Relevant In-State and Out-of-State
            Entities Are Similarly Situated**

     In dormant Commerce Clause analysis, "'discrimination'
simply means differential treatment of in-state and out-of-state
economic interests that benefit the former and burden the
latter." Oregon Waste Systems, 511 U.S. at 99.

     The evidence proffered by the plaintiffs, and much of the
defendants' evidence as well, demonstrates that in-state
optometrists and ophthalmologists who sell eyewear compete with
interstate optical chains to sell the same product —
prescription eyewear — to the same customers in the same retail
eyewear market.  Defendants' own experts, for instance,
testified that a dispensing optometrists' "biggest single
competitor [is] a retail chain." Dep. of Joseph Bruneni
("Bruneni Dep.") at 75:16-24, Ex. 10 of Schechter Decl. re:
Discriminatory Effect.  Moreover, consumers can and do switch
between dispensing optometrists and optical chains to purchase
their prescription eyewear in a market where the competition
between them is "plentiful." Thal Dep. II at 272:21-274:1, Ex. 7
of Schechter Decl. re: Discriminatory Effect.

     Plaintiffs argue that the challenged restrictions treat
these competing entities differently, favoring the former
(in-state entities), and burdening the latter (out-of-state
entities).  Thus, they contend, California has conferred upon

21

1  in-state competitors a monopoly over selling prescription

2  eyewear at the same location where an eye exam is given —

3  "one-stop shopping" — a service that consumers demonstrably

4  prefer.

5      In response, defendants argue that plaintiffs cannot show

6  discrimination because the relevant entities – out-of-state

7  optical chains and in-state optometrists and ophthalmologists

8  who sell eyewear are not "similarly situated."  Defendants argue

9  that plaintiffs, who are optical companies, are not similarly

10  situated to California optometrists or ophthamologists, because,

11  one, "optical companies are business entities, while

12  optometrists and opthamologists are highly educated, trained,

13  and licensed health care professionals, [and two], optical

14  companies and optometrists/opthamologists are also not similarly

15  situated as retail eyewear competitors, as each provides

16  distinct services to different consumer bases."  Def's Opp'n. at

17  8-9.

18      The first of these arguments can be referred to as

19  defendants' formal argument; it contends that the relevant

20  entities are not similarly situated because the entities are of

21  a different form or type from one another.  The second argument

22  is a functional argument; it contends that the two entities are

23  not similarly situated because they function differently in the

24  marketplace, providing different services to different

25  customers.

26      Both of these arguments rely heavily on two Supreme Court

1   cases; it is therefore worth briefly revisiting these cases in

2   light of defendants' arguments before proceeding.

3           **i.    Exxon Corporation v. Governor of Maryland**

4           In Exxon Corp. v. Governor of Maryland, 437 U.S. 117(1978),

5   the Supreme Court addressed a statute which flatly prohibited

6   producers and refiners of petroleum products from opening or

7   operating retail services within Maryland under a variety of

8   corporate or contractual arrangements. Id. at 120, n. 1.   The

9   law was enacted in response to perceived inequities in the

10  allocation of petroleum products to retail outlets during the

11  fuel shortage of 1973.  Various oil companies, all of whom

12  engaged in production and refining as well as in sale of

13  petroleum products, challenged the statute on a number of

14  grounds.  They claimed, inter alia, that the statute violated

15  the Commerce Clause because it discriminated against producers

16  and refiners, all of whom were interstate concerns, in favor of

17  independent retailers, most of which were local businesses.

18          The Exxon Court rejected this contention.  After holding

19  that the statute served the legitimate state purpose of

20  "controlling the gasoline retail market," Id. at 125, the Court

21  separately analyzed its effect on interstate commerce in the

22  producing-refining and retailing ends of the petroleum industry.

23  The Court concluded that the statute could not discriminate

24  against interstate petroleum producers and refiners in favor of

25  locally based competitors because, as a matter of fact, there

26  were no such local producers or refiners to be favored. Id.  For

                                   23

1 the same reason, it concluded that the flow of petroleum

2 products in interstate commerce would not be reduced. <u>Id.</u> at

3 127.

4      The Court also rejected a claim of discrimination at the

5 retail level because the statute placed "no barriers whatsoever"

6 on competition in local markets by "interstate independent

7 dealers" that did not own production or refining facilities.

8 <u>Id.</u> at 126. Despite the fact that the number of stations

9 operated by independent dealers was small relative to the number

10 operated by producer-refiners, the Court concluded that neither

11 the placing of a disparate burden on some interstate competitors

12 nor the shifting of business from one part of the interstate

13 market to another was enough, under the circumstances, to

14 establish a Commerce Clause violation. <u>Id.</u> at 126-127.

15      <u>Exxon</u> is clearly distinguishable. Unlike <u>Exxon</u>, in the

16 instant case, California has enacted a statutory scheme which

17 has the practical effect of barring all out-of-state entities

18 from offering one-stop shopping, while reserving for the

19 principal in-state competitors the right to provide this

20 competitive advantage.

21      In <u>Exxon</u>, the Court found that interstate dealers were able

22 to compete in the same manner as in-state service station owners

23 under the Maryland law. Only gasoline refiners could no longer

24 compete in the Maryland retail market. Unlike the case at bar,

25 in <u>Exxon</u>, other interstate firms could compete in the Maryland

26 market. Under these circumstances, the Court held, the dormant

1   Commerce Clause was not violated.  As the Court explained, "the

2   [dormant Commerce] Clause protects the interstate market, not

3   particular interstate firms, from prohibitive or burdensome

4   regulations."  Id. at 127-28.

5        This holding cannot be extended to the challenged

6   regulations in the case at bar.  Here, the challenged

7   regulations prohibit all interstate firms from competing with in

8   state optometrists on the same terms.  Unlike the facts in

9   Exxon, there are no inter-state companies that can compete with

10  the in-state entities.

11       **ii.  General Motors v. Tracy**

12       In General Motors Corporation v. Tracy, 519 U.S. 278

13  (1997), the Court considered an Ohio statute which imposed a

14  general sales and use tax on natural gas purchases from all

15  sellers, whether in-state or out-of-state, except regulated

16  public entities that met Ohio's statutory definition of a

17  "natural gas company."  A "natural gas company" was defined as

18  any person "engaged in the business of supplying natural gas for

19  lighting, power, or heating purposes to consumers within this

20  state." Id. at 281.  While the term applied to natural gas

21  utilities (termed "local distribution companies" or LDC's)

22  located within Ohio, Ohio's state supreme court had interpreted

23  the statutory term to exclude non-LDC gas sellers, such as

24  producers and independent marketers.  The Supreme Court granted

25  certiorari to decide whether the difference in tax treatment

26  between sales of gas by other entities violated the Commerce

25

1  Clause.

2     The Court found that there was no Commerce Clause violation

3  because the favored and disfavored entities were not similarly

4  situated.   As the Court explained:

5           Conceptually, of course, any notion of discrimination
            assumes a comparison of substantially similar
6           entities. Although this central assumption has more
            often than not itself remained dormant in this Court's
7           opinions on state discrimination subject to review
            under the dormant Commerce Clause, when the allegedly
8           competing entities provide different products, as
            here, there is a threshold question whether the
9           companies are indeed similarly situated for
            constitutional purposes.  This is so for the simple
10          reason that the difference in products may mean that
            the different entities serve different markets, and
11          would continue to do so even if the supposedly
            discriminatory burden were removed.

12

13 Id. at 298.

14     Significantly for present purposes, this conclusion was not

15 based on a determination that the two natural gas sellers were

16 not of the same type and were not similarly situated.  As the

17 Court explained, "in the absence of actual or prospective

18 competition between the supposedly favored and disfavored

19 entities in a single market there can be no local preference,

20 whether by express discrimination against interstate commerce or

21 undue burden upon it, to which the dormant Commerce Clause may

22 apply."  Id. at 300.  In short, the Court appeared to focus on

23 competition and the market served.[7]

24 _____

25      [7]   See also Camps NewFound/Owatonna, Inc. v. Town of
   Harrison, 520 U.S. 564, 582 n.16 (1997) (observing that the Tracy
26 "Court premised its holding . . . on the view that sellers of
   'bundled' and 'unbundled' natural gas were principally competing

1          **b.  Defendants' "Formal" Argument**

2          The court first addresses defendants' formal argument,

3     i.e., the contention that there is no discrimination because the

4     relevant entities are of different types and thus cannot be

5     compared.

6          The Sixth Circuit recently addressed the same issue in

7     LensCrafters, Inc. v. Robinson, 403 F.3d 798, 802 (6th Cir.

8     2005).[8]  There, the Sixth Circuit found that a Tennessee statute

9     which prohibited interstate eyewear retailers from leasing space

10    in their stores to optometrists was not discriminatory in

11    purpose or effect and therefore, did not violate the dormant

12    Commerce Clause.

13         In reviewing the discriminatory effect of the statute, the

14    Sixth Circuit held that:

15              [L]icensed optometrists and optometric stores such as
                LensCrafters are not similarly situated because they
16              provide different services to the market. Unlike
                retail optical stores, licensed optometrists are
17              healthcare providers and, as such, have unique
                responsibilities and obligations to their patients
18              that are not shared by optometric stores.

19    LensCrafters,  403 F.3d 798, 804 (6th Cir. 2005).

20

21         With the greatest of respect, I cannot agree with the Sixth

22    Circuit's reasoning.  As this court reads the dormant Commerce

23    _____

24    in different markets.").

25         [8] This decision was issued after the briefing in the pending
      motions was complete.  Although the parties did not address the
26    Sixth Circuit's decision in their papers, the case was discussed
      at length at oral argument.

1  Clause cases, the question is not whether the entities are

2  business corporations versus educated professionals, but whether

3  they "provide different products" because a "difference in

4  products may mean that the different entities serve different

5  markets, and would continue to do so even if the supposedly

6  discriminatory burden were removed."  <u>Tracy</u>, 519 U.S. at 298.

7       In conducting the "similarly situated" inquiry, courts have

8  consistently considered whether entities engage in  competition

9  rather than whether the entities are of different types.

10 Indeed, in instances where laws do not facially discriminate

11 against interstate commerce but a discriminatory effect is

12 claimed, it will not be uncommon that the relevant entities are,

13 at least to some extent, of different types. Thus the question

14 is not whether the entities are different, but whether they are

15 in competition.  <u>See</u>, <u>e.g.</u>, <u>Continental Illinois Corp. v. Lewis</u>,

16 827 F.2d 1517 (11th Cir. 1987) (examining not the status of the

17 entities, but analyzing whether the favored and disfavored

18 entities were both competing for the same market); <u>Globe Glass &</u>

19 <u>Mirror Co. v. Brown</u>, 917 F. Supp. 447 (E.D. La. 1996) (noting

20 that the fact that favored in-state entity and disfavored

21 out-of-state entity had different "statuses" is irrelevant);

22 <u>Bacchus Imports, Ltd. v. Dias</u>, 468 U.S. 263 (1984) ("As long as

23 there is some competition between the locally produced exempt

24 products and non-exempt products from outside the State, there

25 is discriminatory effect.").

26      Put directly, it appears to this court that it is the

activity or conduct engaged in that is compared, without regard
to the status of the entity.  In other words, to figure out who
the similarly situated entities are, the court looks at whether
or not the favored and disfavored entities compete in the same
market, with the same products, for the same customers.

As previously noted, the evidence in this case is
overwhelming that interstate optical companies, such as
Lenscrafters, and in-state optometrists compete for the same
customers with the same products in the same market.  As
defendants' own expert explained, "the guts of dispensing
eyewear in a medical office or in an optometric office, or in a
retail chain, they're basically the same."  Bruneni Dep. at
23:8-19, Ex. 10 of Schechter Decl. re: Discriminatory Effect.
Indeed, it is undisputed that dispensing optometrists and
optical chains compete for the exact same consumers.  As
defendants concede, consumers readily switch between
optometrists and retail optical chains for their prescription
eyewear purchases. See Defs.' Resp. to NAOO RFA No. 21, Ex. 18
of Schechter Decl. re: Discriminatory Effect; Defs.'s Suppl.
Resp. to ECCA First Set of Interrogs., No. 5, Ex. 11 of
Schechter Decl.  Dr. Thal, defendants' expert, characterized the
competition as "plentiful."  Thal Dep. Vol. II at 272:21-274:1;
330:2-13, Ex. 6  of Schechter Decl.  Mr. Bruneni, another
defense expert, testified that a dispensing optometrists'
"biggest single competitor [is] a retail chain."  Bruneni Dep.
at 40:16-41:9; 61:14-62:3; 65:5-17; 75:16-24, Ex. 10 of

1 | Schechter Decl.

2 | **c.   Defendants' "Functional" Argument**

3 | Defendants' functional argument proceeds from the correct

4 | premise, as outlined above, that the proper inquiry is how the

5 | relevant entities compete in the market.  Defendants argue that

6 | the entities are not similarly situated because the optometrists

7 | and opthamologists provide services – health services – that

8 | optical chains like Lenscrafters do not, and that they have

9 | special training that staff at Lenscrafters do not.  Hence,

10 | defendants argue, they are competing for different customers and

11 | in a different market.

12 | The first problem with defendants' argument is that they

13 | have produced no evidence to demonstrate that the entities are

14 | really competing for different customers with respect to eyewear

15 | sales, and, as discussed above, the evidence in fact contradicts

16 | that contention quite squarely.

17 | The second problem, however, is a conceptual one. The

18 | conduct at issue in this litigation is the retail selling of

19 | prescription eyewear, and for that activity, the special

20 | training of optometrists and ophthalmologists is irrelevant.  If

21 | the selling of eyewear had a component that was health related,

22 | then all optometrists would be required to sell glasses and no

23 | optical companies or opticians would be permitted to do so.

24 | That, however, is simply not the case.

25 | Optometrists who sell eyewear wear two hats — one as a

26 | provider of health care services and another as a retail seller

30

1  of eyewear.  When wearing the hat of the retailer, an
2  optometrist is in direct competition with optical companies such
3  as plaintiffs.  For these reasons, the court concludes that
4  optometrists who sell eyewear are similarly situated to
5  out-of-state optician companies for constitutional purposes.
6  Tracey, 519 U.S. at 298.

7           **3.   Relevance of Purpose Evidence**

8       Finally, although plaintiffs do not advance a purpose-based
9  argument in their briefs, they have presented evidence
10  suggesting that some of the provisions challenged in this
11  litigation were enacted with a purely protectionist purpose.
12  Specifically, the evidence shows that Section 655, arguably the
13  key provision being challenged, was introduced in the California
14  Legislature, as the Act's chief sponsor put it, "on behalf of
15  the California Optometric Association in an effort to protect
16  California from some of the problems . . . being experienced in
17  eastern states, where large business interests have completely
18  taken over the optometric profession."  Letter from Sen. Sherman
19  to Gov. Reagan, Ex. 13 of Schechter Decl. re: Discriminatory
20  Effect.  This evidence is quite strong.  See S. Dakota Farm
21  Bureau v. Hazeltine, 340 F.3d 583, 593 (2003) ("the most
22  obvious" evidence of discriminatory purpose "would be direct
23  evidence that the drafters . . . intended to discriminate
24  against out-of-state businesses.").

25      While this evidence does not shed further light on how the
26  challenged restrictions operate in practice, it does buttress

the conclusion that the regulatory scheme is in fact an instance of economic protectionism.  "Discriminatory purpose is at the heart of dormant Commerce Clause analysis and is often incorporated into both first-tier analysis and second-tier Pike balancing analysis."  S. Dakota Farm Bureau, 340 F.3d at 596; see also Fulton Corp. v. Faulkner, 516 U.S. 325, 330 (1996) (describing dormant Commerce Clause as a prohibition on state regulations designed with the purpose of benefitting in-state interests by burdening out-of-state interests); West Lynn Creamery, 512 U.S. at 196 (noting purpose of state's unconstitutional pricing scheme although resting decision on statute's discriminatory effect); Taylor, 477 U.S. at 148 (equating purposeful economic protectionism with per se invalidity); Donald H. Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L Rev. 1091, 1206-1233 (1986) (presenting and defending thesis that Supreme Court's dormant Commerce Clause analysis is driven by desire to prevent purposeful protectionism).

**C.   Non-Discriminatory Alternatives**

Given the court's conclusion that the challenged laws have a discriminatory effect on interstate commerce, "the regulation is subject to strict scrutiny under which it is the state's burden to show that the discrimination is narrowly tailored to further a legitimate interest."  Conservation Force, Inc., 301 F.3d at 995.

If a law discriminates against interstate commerce, it is

32

1  "virtually per se invalid," <u>Oregon Waste Systems, Inc.</u>, 511 U.S.

2  at 99, unless "the municipality can demonstrate, under rigorous

3  scrutiny, that it has no other means to advance a legitimate

4  local interest." <u>Carbone</u>, 511 U.S. at  391; <u>see also</u> <u>Hughes v.</u>

5  <u>Oklahoma</u>, 441 U.S. 322, 337-338 (1979)(explaining the state's

6  burden to show, under "the strictest scrutiny," that the

7  regulation is the "least discriminatory alternative" to advance

8  a legitimate purpose); <u>Camps Newfound/Owatonna</u>, 520 U.S. at 582

9  (observing that discrimination against interstate commerce

10  invokes the "strictest scrutiny" which "is an extremely

11  difficult burden").

12       To date, the Supreme Court has upheld discriminatory laws

13  only where the discrimination was justified by the threat of

14  death or disease. <u>See</u> <u>e.g.</u>, <u>Maine v. Taylor</u>, 477 U.S. 131 (1986)

15  (upholding Maine's prohibition on importing live baitfish

16  because of the potential for destruction of Maine's fisheries);

17  <u>Clason v. Indiana</u>, 306 U.S. 439 (1939) (upholding Indiana's

18  restrictions on transporting dead animals without a license

19  because of the potential for disease).

20       To survive summary judgment, defendants must demonstrate

21  issues of fact regarding whether the laws are justified by a

22  valid factor unrelated to economic protectionism and, if so,

23  that no neutral alternatives are available.  <u>Envtl. Tech.</u>

24  <u>Council v. Sierra Club</u>,  98 F.3d 774, 786 (4th Cir. 1996); <u>see</u>

25  <u>also</u> <u>S. Dakota Farm Bureau, Inc.</u>, 340 F.3d at  597 (explaing

26  that defendant has high burden of demonstrating ineffectiveness

1  of potential alternatives); <u>Johnson, MacDonald & Associates v.</u>

2  <u>Webster Plastics</u>, 856 F. Supp. 1249, 1253 (S.D. Ohio

3  1994)("Under the strict scrutiny test, it is the defender of the

4  statute which must come forward with proof there is no

5  non-discriminatory alternative.").

6      **1.   Legitimate Local Purpose**

7        The court first considers whether defendants have set forth

8  legitimate interests for the challenged regulations.  Although

9  the Supreme Court has adopted a broad construction of the

10  applicability of the dormant Commerce Clause, it has cautioned

11  that "[t]he Commerce Clause . . . does not elevate free trade

12  above all other values." <u>Maine</u>, 477 U.S. at 151. That said,

13  states have broad powers to regulate in the interests of their

14  citizens.

15        Here, defendants assert that the challenged laws were

16  designed to protect against corporate influence interfering with

17  optometrists' professional judgment.  Alvin Korobkin Dep., Ex.

18  TT in support of Defs.' Mot for Summ. J. and in Opp'n to Pls.'s

19  Mots. for Summ. J. ("Defs.' Ex.").  Defendants maintain that

20  "patient care and privacy are being compromised when lay optical

21  companies control optometrists."  Defs.' Opp'n at 26.

22        It is well established that a state has the right to impose

23  regulations in the interest of local health and safety.  <u>See</u>

24  <u>Maine</u>, 477 U.S. at 131; <u>H.P. Hood and Sons</u>, 336 U.S. at 535

25  ("This court consistently has rebuffed attempts of states to

26  advance their own commercial interests by curtailing the

1  movement of articles of commerce, either into or out of the
2  state, while generally supporting their right to impose even
3  burdensome regulations in the interest of local health and
4  safety.").

5      As explained below, even assuming that defendants have a
6  legitimate interest in protecting public health through the
7  challenged regulations, defendants fail to establish that there
8  exist no non-discriminatory alternative measures to address this
9  exact interest.

10     **2.   Non-Discriminatory Alternatives**

11     The court assumes for the purpose of this analysis that
12  corporate domination of eye professionals presents a real
13  danger. Defendants contend that "no less discriminatory
14  alternative measures exist which would effectively protect the
15  public from the evils that occur when lay corporations control
16  health care professionals." Defs.' Opp'n at 24.  They maintain
17  that the challenged laws are the only means by which to insure
18  that the public receive non-biased eye care and that neither
19  neutral laws or a scheme akin to the Knox-Keene plan would be
20  effective at preventing the evils which plague optometrists who
21  work for corporate stores.  Defendants maintain that the "only
22  way to combat the problem is to free all optometrists from that
23  lay control by separating them from lay optical companies, as
24  [the challenged statutes] do."  Defs.' Opp'n at 22.

25     In opposing plaintiffs' motion for summary judgment,
26  defendants implicitly argue that there remains an issue of

1  material fact which defeats summary judgment, namely, whether

2  the public receives a lower level of care from optometrists

3  affiliated with chains as compared to dispensing optometrists.

4  In support of this contention, defendants present literally

5  hundreds of pages of evidence which suggests that the quality of

6  service provided by corporately managed optometrists is poor.

7  Nonetheless, for the reasons explained herein, defendants fail

8  to tender sufficient facts so as to defeat plaintiffs' motion

9  for summary judgment.

10           **a.   Defendants' Evidence Regarding the Quality of**
                     **Care Provided by Optometrists Associated with**
11                   **Chains such as LensCrafers.**

12       Defendants present evidence of the various problems which

13  arise when optometrists are employed by companies such as

14  Lenscrafters.  This evidence generally suggests that

15  Lenscrafters exerts pressure on optometrists who work within

16  LensCrafter stores.  For example, limitations are placed upon

17  the optometrists so that they prescribe LensCrafters'

18  proprietary optical goods, and optometrists are evaluated based

19  upon the percentage of their eye exam patients who purchase

20  Lenscrafters' eyewear.  <u>See</u> Kim Lee Dep., Defs.' Ex. NN.

21  Similarly, Lenscrafters pressures its optometrists to perform a

22  certain numbers of dilation or retinal photographs regardless of

23  need.  <u>Id.</u>  Even if the court were to accept defendants'

24  recitation  of all the evidence they present, there are two

25  general problems which defeat their opposition to plaintiffs'

26

                                    36

1   motions.

2       First, plaintiffs present uncontroverted evidence that the

3   same practices which defendants complain of occur in the

4   dispensing optometrists setting as well.  In other words, the

5   setting (optometrists affiliated with chains versus dispensing

6   optometrists) makes no difference as to practices – the same

7   practices occur in both settings.  With one exception, (which is

8   discussed below), defendants fail to present any evidence which

9   compares the quality of care between dispensing optometrists and

10  optometrists who work for optical chains.

11      Not knowing if the quality of service varies between

12  practice setting is an important issue in this case.  As

13  mentioned earlier, defendants central argument is that "the only

14  way to combat the problem [of corporate control] is to free all

15  optometrists from that lay control by separating them from lay

16  optical companies as [the challenged restrictions do]."  Defs.'

17  Opp'n at 22.  However, as plaintiffs argue, in order to accept

18  this argument, the court would have to find that optometrists

19  provide worse care when affiliated with a chain than when acting

20  as a dispensing optometrist.  The court cannot make that

21  finding.  It is not enough to prove that optometrists in general

22  provide shoddy service.  In this regard, defendants simply fail

23  to show that the quality of care is comparatively worse or

24  better depending on the practice setting.  Plaintiffs,

25  meanwhile, set forth sufficient facts which reveal that the same

26  problem practices which defendants allege are prevalent in the

1  corporate setting, are just as prevalent when optometrists

2  dispense eyewear.

3       The court reviews some of the facts relied on by both

4  parties to illustrate this point.  First, defendants contend

5  that optometrists who co-locate with a chain are required to

6  prescribe LensCrafters optical goods.  Defs.'s Opp'n at 8, 9-10.

7  Defendants suggest that "[f]or some patients, use of a

8  substitute LensCrafters' product could adversely affect a

9  patient's vision."  Id. at 9:15-16.

10      Plaintiffs maintain that the same practice occurs with

11  dispensing optometrists.  This is regarded as an "important

12  benefit" to private optometrists.  Bruneni Dep. at 72:21-73:4,

13  74:18-21), Ex. 4 of Suppl. Moynihan Decl.  Indeed, there are

14  proprietary brands (such as the Varilux brand) which are sold

15  only by private optometrists.  Id. at 80:16-22.  Dr. Neil

16  Gailmard, plaintiffs' expert, explained that in private

17  practices, some dispensing optometrists write prescriptions in

18  such a way as to make it difficult for patients to have them

19  filled other than at that optometrist's dispensary.  Gailmard

20  Dep. at 91:1-9, Ex. 8 of Suppl. Moynihan Decl.

21      Second, defendants contend that co-located practices can

22  include incentives and bonus systems which create a conflict of

23  interest for the optometrist as a health professional.  Again,

24  plaintiffs point to evidence which suggests that the same

25  incentive schemes operate in offices of dispensing optometrists

26  as well.  Plaintiffs rely on evidence which demonstrates that

compensation for dispensing optometrists is based directly on
the number of eye exams provided, the sale of eyewear and the
sale of premium brands.  Thal Dep. II at 339:15-340:14, Ex. 22
of Suppl. Moynihan Decl.; Bruneni Dep. at 125:24-126:2, Ex. 4 of
Suppl. Moynihan Decl. ("If the private optometrist quits selling
premium lenses, he would quit driving his Mercedes.").

In fact, dispensing optometrists traditionally seek to
increase revenues in their dispensaries by paying their
employees, including associate optometrists, bonuses or
commissions based on the sales of certain products.  Gailmard
Dep. at 101:9-103:23, Ex. 8 of Suppl. Moynihan Decl. (describing
methods used by dispensing optometrists to motivate employees,
including optometrists, to sell more, for example, commissions,
bonuses and other incentives); Dep. of Annette Juneau ("Juneau
Dep.") at 80:3-81:12, Ex. 11 of Suppl. Moynihan Decl.
(nationally recognized practice management consultant testified
that "spiffs" - paying bonuses based on sales of particular
frames or add-ons - are a typical and traditional manner of
compensating optical employees in a dispensing optometrist's
practice).

Associate optometrists employed by other dispensing
optometrists also are given financial incentives to prescribe
certain products, write more prescriptions and see more
patients.  Dep. of Bradley Williams ("Williams Dep.") at
69:24-70:13, 85:5-87:9, Ex. 26 of Suppl. Moynihan Decl.
(Practice management consultant with California clients

1  testified that it is quite typical for an associate optometrist,

2  employed by another optometrist, to receive a productivity bonus

3  or compensation component to motivate him to see more patients

4  and build the business); Juneau Dep. at 109:15-110:1 (explaining

5  that associate optometrists are often compensated by their

6  employer optometrists based upon a percentage of professional

7  fees and optical revenue produced, typically 20%).

8      Third, defendants tender evidence of Lenscrafter employees

9  "transitioning the patients" from the optometrists' exam area to

10  the optical sales area.  Defs.' Opp'n at 11:21; Lee Dep. at 131,

11  Defs.' Ex. NN; Papadakis Dep. at 133-134, Defs.' Ex. RR.  Again,

12  defendants suggest that this practice may not be in the best

13  interest of the patient's health.  Plaintiffs, however, present

14  evidence that "transitioning" is a common part of private

15  optometry practice, known as part of the "circular flow"

16  practice management model.  Gailmard Dep. at 94:3-95:21, Ex. 8

17  of Suppl. Moynihan Decl; Alan Limfat Dep. at 87:10-24, 89:12-

18  90:5, Ex. 12 of Suppl. Moynihan Decl.  Practice management

19  consultants teach the practice as a method of retaining

20  optometric patients as dispensing customers.  Gailmard Dep. at

21  126:6-127:9, 127:16-129:9, Ex. 8. of Suppl. Moynihan Decl.

22  Thus, dispensing optometrists are taught to rely on their

23  relationship of trust and position of authority with their

24  patients to sell more eyewear.

25      Fourth, defendants present evidence that optometrists

26  affiliated with chains perform "quick" eye exams.  Defs.' Opp'n

1  10; Thal declaration, para. 7-10; "Sweet Lemons" article, Defs.'

2  Ex. II.   However, defendants fail to establish that this amount

3  of time is not comparable to the amount of time spent by

4  dispensing optometrists.   Indeed, plaintiffs point to evidence

5  which shows that optometrists in private practice settings may

6  spend the same or less time on eye exams.   Gailmard Dep. at

7  142:20-24, Ex. 8 of Suppl. Moynihan Decl. (optometrist can

8  perform a complete eye exam in 15 minutes); id. at 118:21-119:18

9  (scheduling 15 minute eye exam slots is not too fast to deliver

10 patient care of the absolute highest quality); Bradley Williams

11 Dep. at 188:25-191:12, Ex. 26 of Suppl. Moynihan Decl. (it is

12 "nonsense" to say that an eye exam cannot be accomplished in

13 less than 20 minutes of optometrist time); Elliott Shapiro Dep.

14 at 76:24-77:5, Ex. 20 of Suppl. Moynihan Decl. (time spent and

15 number of patients seen while in private practice was "virtually

16 identical" to his practice at EYEXAM).

17      Plaintiffs also point to evidence presented by defendants

18 that similar complaints are raised against dispensing

19 optometrists and optometrists in chain stores.   See, e.g.,

20 Report of Patient Abuse, Defs.'s Ex. FF-17 (LH 1217-3237 ("this

21 situation could have occurred with any other optometrist and

22 has"); id. at LH 1217-3240 (complaint regarding practice owned

23 and operated by optometrists); id. at LH 1217-3247 (complaining

24 about "multiple office practices, even when owned by an

25 optometrist"); id. at LH 1217-3252 ("doctors of optometry who

26 own multi-branch offices are more concerned with being

41

1  businessmen rather than with being eye health practitioners");

2  id. at LH 1217-3255 (complaints regarding "doctor who owned the

3  practice"); id. at LH 1217-3257 (complaint regarding optometric

4  practice "owned and administered by licensed optometrists"); id.

5  at LH 1217-3258 (complaining about a practice "run by an

6  optometrist whose primary goal would appear to be solely

7  monetary.").

8       There is, however, some evidence presented by the

9  defendants that deserves closer examination.  Defendants rely on

10 the declaration of Phillip Parker, a professor of economics and

11 international strategy.  Attached to his declaration are two

12 reports.  The first report is entitled, "The Detection of

13 Selected Eye Conditions: A Study of Quality Differences Between

14 Commercial and Private Optometrists in the Boroughs of Brooklyn,

15 Manhattan and Queens."  It is dated 1985.  This study purports

16 to show that optometrists affiliated with chain stores provide

17 quick and less thorough eye examinations than their independent

18 counterparts. See Ophthalmic Practice Rulemaking Statement,

19 Robert R. Nathan Associates, Inc., Defs.' Ex. FF-21.  The second

20 report focuses exclusively on optometry in California and seeks

21 to compare the two settings of optometry.  Defs.' Ex. HH.  Based

22 on these reports, Parker concludes that there is a difference in

23 quality between dispensing optometrists and optometrists who

24 work for chains.

25      It appears to the court that the reports cannot be relied

26 upon for several reasons.  First, the reports were written by

42

1  self-labeled "consulting economists," not optometrists.  See

2  Defs.' Ex. FF-21 at LH 1217-4193.  Accordingly, neither Parker

3  (an economist) nor the other authors of the reports can assess

4  the quality of care patients receive.  Second, Parker's

5  conclusions, as well as the conclusions in the reports, are

6  based almost exclusively on the amount of time that an

7  optometrist spends with a patient.  Parker concludes that less

8  time equates to a lower quality of care.  See Defs.' Ex. HH.

9  Yet, Parker presents no evidence that this is in fact the case.

10  Most importantly, plaintiffs tender sufficient undisputed facts

11  which show that less time does not necessarily equate to a lower

12  quality of care.  See, e.g., Julie Ann Wagstaff Dep. at 28:9-23,

13  85:25-87:7, 143:25-146:2, Ex. 25 of Suppl. Moynihan Decl.;

14  Galimard Dep. at 142:20-24, 118:21-119:18, Ex. 8 of  of Suppl.

15  Moynihan Decl.; Williams Dep. at 188:25-191:12, Ex. 20  of

16  Suppl. Moynihan Decl.  Moreover, as plaintiffs point out, in the

17  report on California, see Defs.' Ex. HH, Parkers' underlying

18  data was from the Attorney General's investigation of Pearl

19  Vision in which investigators posed as patients without real

20  problems.  Because the investigators had no real problems, they

21  required less time for an exam.  Decl. of Richard Bennett at ¶

22  37.[9]

23  _____

24      [9] A third reason is that the report entitled, "The Detection
   of Selected Eye Conditions", Defs.' Ex. FF-21, only looked at New
25  York City.  New York has a regulatory scheme that is different and
   distinct from California.  See N.Y. Laws §§ 7101 et seq.; N.Y.
26  Comp. Codes R. & Regs. tit. 8, §§ 66.1.  Given that the laws are
   different, comparing optometry practice in New York as compared to

1    In sum, these two reports fall short of establishing that

2    there remains a genuine issue of fact regarding the quality of

3    care by optometrists associated with chains as compared to

4    optometrists who dispense eyewear.[10]  Moreover, and perhaps most

5    importantly, even if the court were to accept Parker's

6    representations as true (that there is some variance between

7    settings), as discussed herein, defendants fail to establish

8    that there are no non-discriminatory alternatives which would

9    address these concerns.  In short, no geuine dispute exists.

10   There is a second problem with defendants' evidence.

11   Defendants maintain that public health is the legitimate

12   interest that the challenged laws seek to protect.  Yet, the

13   record is essentially silent as to how the practices identified

14   by defendants actually harm the public's health.  In other

15   words, defendants state that public health is its main concern,

16   however, there is no evidence which links the complained of

17   practices to actual harm to the public's health.  For example,

18   defendants do not explain how short eye exams harm a patients'

19   health, or how prescribing only Lenscrafters eyewear endangers

20   health.  Similarly, there is no evidence that "transitioning"

21   ──────────────────

22   California may well be like comparing apples and oranges.

23        [10]   It is important to recall that it is insufficient to
     simply tender an opposing view. Rather the opposing party must
24   tender facts which demonstrate that the dispute is genuine, i.e.
     that a reasonable trier of fact could return a verdict for the
25   nonmoving party.   Anderson v. Liberty Lobby Inc., 477 U.S. 242,
     248-49 (1986), Cline v. Industrial Maintenance  Engineering Co.,
26   200 F. 3d 1223, 1228 (9th Cir. 1999).

44

1  customers from an exam to the store area threatens the public's

2  health.

3      As mentioned earlier, one of the few instances in which the

4  Supreme Court has found that discriminatory regulations pass

5  strict scrutiny is when public health is at issue.  <u>See</u> e.g.,

6  <u>Maine</u>, 477 U.S. at 313.  Here, there is simply no evidence that

7  there are significant health risks that the challenged laws

8  protect against.  On summary judgment, the court is to draw all

9  reasonable inferences in favor of the non-moving party.  <u>See</u>

10 <u>Matsushita</u>, 475 U.S. at 587.  Drawing an inference that the

11 practices cited to by defendants cause harm to the public

12 without evidence to support that fact is not a reasonable

13 inference. As I have repeatedly noted "inferences are not drawn

14 out of the air, and it is the opposing party's obligation to

15 produce a factual predicate from which the inference may be

16 drawn." <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp.

17 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th

18 Cir. 1987).

19     For the reasons discussed, there is no evidence that the

20 quality of eye care varies by practice setting.  Moreover, there

21 is no evidence that the practices that defendants complain of

22 actually harm the public's health.

23     It therefore follows that the defendants' justification for

24 the challenged law (that no other laws can protect the public's

25 health) fails.  Stated somewhat differently, defendants cannot

26 establish that the challenged laws are not "a 'last ditch'

1  effort to solve the problem after nondiscriminatory alternatives
2  have proved unfeasible."  <u>Hughes</u>, 441 U.S. at 323.

3        This conclusion is consistent with established dormant
4  Commerce Clause doctrine.  For example, in striking down laws
5  restricting in-state treatment and disposal of hazardous waste
6  generated in other states, the Fourth Circuit found that
7  "[t]here is no basis to distinguish out-of-state waste from
8  domestic waste over concern for citizens health, safety, and
9  welfare . . . Hazardous waste is equally dangerous whether
10 generated within South Carolina or out-of-state." <u>Envtl. Tech.</u>
11 <u>Council v. Sierra Club</u>, 98 F.3d at 786; <u>see also</u> <u>Chemical Waste</u>
12 <u>Mngy., Inc. v. Hunt</u>, 504 U.S. 334, 344-45 (1992)(holding that
13 hazardous waste's danger to the health and safety of Alabama's
14 citizens "does not vary with the point of origin of the waste").
15 Similarly, in the case at bar, defendants fail to establish that
16 the public's health is in greater danger when receiving care
17 from an optometrist affiliated with a chain as compared to
18 receiving care from a dispensing optometrist.

19      In <u>Oregon Waste Systems, Inc.</u>, 511 U.S. at 101, the Supreme
20 Court addressed the constitutionality of an Oregon law imposing
21 a $2.50 per ton surcharge on in-state disposal of solid waste
22 generated in other states in comparison to a fee $0.85 per ton
23 on disposal of waste generated within Oregon.  The Supreme Court
24 concluded that the "respondents have not offered any safety or
25 health reason unique to nonhazardous waste from other States for
26 discouraging the flow of such waste into Oregon." <u>Id.</u> at 101.

The Supreme Court's reasoning applies with equal force here. Defendants in the case at bar have not offered any health benefits or disadvantages that are unique to optometrists who associate with a chain.  In fact, it appears that the potential harm to patients exists irrespective of the setting.[11]

### b.   The Knox-Keene Act as an Example of a Non-Discriminatory Alternative

Prior to the California Supreme Court's ruling in People v. Cole, some out of state optical chains such as LensCrafters had offered one-stop shopping in California by associating with Knox-Keene plans.  Lovejoy Dep. at 23:16-22, Ex. G of Moynihan Decl.  As explained previously, these specialized health care service plans are a type of HMO licensed under the California Knox-Keene Health Care Service Plan Act of 1975, Health & Safety Code section 1340, et seq.  Knox-Keene plans employ or contract with optometrists to provide optometric services to plan members.  Some interstate optical chains leased space in their California stores to Knox-Keene plans that provided optometric services.

The Act imposes numerous requirements on licensed plans to ensure that commercial interests do not interfere with the professional judgment of health care providers.  For example, Knox-Keene plans must employ a medical director and must establish and adhere to a quality assurance program.  Cal.

---

[11]   Being an eyeglass wearer myself, the conclusion that eye care may well be shoddy whereever provided, is, to say the least, cold comfort.

1   Health & Safety Code § 1370.  Similarly, Knox-Keene plans must

2   make extensive disclosures, including medical and fiscal audits,

3   to the DMHC.  Id., §§ 1351, 1380, 1382, 1384; Cal. Code of

4   Regs., tit. 28, §§ 1300.84.06, 1300.84.2, 1300.84.3.

5        Plaintiffs assert that these relationships have enabled out

6   of state optical companies to compete in California with

7   dispensing optometrists.  Plaintiffs also submit that the

8   Knox-Keene scheme is a less restrictive, non-discriminatory

9   alternative to the challenged restrictions.  See Pls.' Mot. for

10  Sum. J. at 11.

11       Defendants' argue in their opposition that the Knox-Keene

12  plan is not an alternative because the California Fourth

13  District Court of Appeals held that the Knox-Keene Plan is not

14  exempt from the restrictions articulated in the challenged laws.

15  As previously noted, since the parties submitted the pending

16  motions, the California Supreme Court decided People v. Cole, 38

17  Cal. 4th 964 (2006), holding that the Knox-Keene Act did not

18  exempt optical companies from the challenged laws at issue in

19  this case.

20       The question before the California Supreme Court was

21  whether the legislature intended for there to be an exception to

22  the challenged laws for out-of-state optician companies

23  affiliated with Knox-Keene plans.  The Supreme Court did not

24  address whether the underlying laws themselves (which are the

25  subject of this litigation) violated the dormant Commerce

26  Clause.  Thus, to hold that the underlying laws violate the

48

1   Commerce Clause would in no way contradict the holding of the

2   California Supreme Court.

3        Moreover, this court's purpose in discussing the Knox-Keene

4   Act is merely to demonstrate that there are non-discriminatory

5   schemes which the State could adopt and which would address the

6   health interests of the State.  The court is not endorsing the

7   Knox-Keene Act arrangements per se, but merely discussing a

8   regulatory scheme which is an example of a non-discriminatory

9   alternative to the challenged regulations.

10       For these reasons, the court finds that defendants have

11  failed to demonstrate issues of fact regarding whether the laws

12  are justified by a valid factor, and if so, that there are no

13  neutral alternatives available.  Envtl. Tech. Council v. Sierra

14  Club, 98 F.3d at 786.

15                              **V.**

16                          **CONCLUSION**

17       Accordingly, the court concludes that the challenged laws

18  substantially effect and discriminate against interstate

19  commerce and therefore are subject to strict scrutiny under the

20  dormant Commerce Clause.  Although California has legitimate

21  interests in regulating the provision of health services,

22  defendants have failed to meet its burden of showing that it has

23  no other means to advance its legitimate interests.  The court

24  therefore finds that the challenged laws violate the dormant

25  Commerce Clause.  The court orders as follows:

26       1.   Plaintiffs' motion for summary judgment as to

                              49

discriminatory effect is GRANTED.

2.    Plaintiffs' motion for summary judgment as to non-
      discriminatory alternatives is GRANTED.

3.    Defendants' motion for summary judgment is DENIED.

4.    Requests to file amicus briefs are DENIED.

5.    The motions to strike filed by both defendants and
      plaintiffs are DENIED.

IT IS SO ORDERED.

DATED: December 6, 2006.


                              LAWRENCE K. KARLTON
                              SENIOR JUDGE
                              UNITED STATES DISTRICT COURT