1

2

3

4

5

6

7

8

9                           UNITED STATES DISTRICT COURT

                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   NATIONAL ASSOCIATION OF
     OPTOMETRISTS & OPTICIANS;
12   LENSCRAFTERS, INC; and EYE            NO. CIV. S-02-1464 LKK/DAD
     CARE CENTERS OF AMERICA, INC.,
13
               Plaintiffs,
14
          v.
15
     EDMUND G. BROWN, JR., in his
16   official capacity as Attorney
     General of the State of California;
17   and CHARLENE ZETTEL, in her official              O R D E R
     capacity as Director of the
18   Department of Consumer Affairs,

19             Defendants.
     _____/
20

21        This case concerns the constitutionality of certain

22   California statutes and regulations. These statutes and

23   regulations prohibit optical companies from offering

24   prescription eyewear at the same location in which eye

25   examinations are provided and from advertising that eyewear and

26   eye examinations were available in the same location.

                                      1

1  Plaintiffs, an association of optometrists and opticians and two

2  out-of-state optical companies, contend that these statutes and

3  regulations violate the dormant Commerce Clause because their

4  burden on interstate commerce excessively outweighs the local

5  benefits of the law. Plaintiffs and defendants each bring cross-

6  motions for summary judgment. For the reasons described below,

7  plaintiffs' motion is denied and defendants' motion is granted.

8                          **I. BACKGROUND**[1]

9       In 2002, plaintiffs, the National Association of

10  Optometrists and Opticians ("NAOO") and two out-of-state optical

11  companies, LensCrafters, Inc. ("LensCrafters") and Eye Care

12  Centers of America, Inc. ("ECCA"), filed a complaint against

13  defendants, the Attorney General of California and the Director

14  of the California Department of Consumer Affairs, seeking

15  declaratory and injunctive relief. Plaintiffs challenge Sections

16  655, 2556, and 3130 of California's Business & Professions Code

17  and their companion regulations, 16 California Code of

18  Regulations, Title 16, Sections 1399.251 and 1514. These

19  provisions prohibit optical companies from offering prescription

20  eyewear at the same location in which eye examinations are

21  provided and from advertising that eyewear and eye examinations

22  are available at the same locations. Optometrists and

23  ophthalmologists who are unaffiliated with optical companies,

24  ────────────

25       [1] Several motions to seal were filed by parties concerning the
    briefs and exhibits in these motions. The court addresses these
26  motions in a concurrently filed order.

1  however, may offer prescription eyewear at the same location in

2  which eye examinations are provided and may advertise these

3  services.

4      Plaintiffs allege that these statutes and regulations

5  violate the dormant Commerce Clause because local optometrists

6  and ophthalmologists may offer "one-stop shopping" of both

7  eyewear and eye examinations, which they contend is the

8  preferred or dominant business model, and out-of-state optical

9  companies are prohibited from providing the same one-stop

10 shopping. Defendants argue that these statutes and regulations

11 do not violate the dormant Commerce Clause because they promote

12 the health of Californians by protecting the optometric

13 profession from being taken over by large business interests.

14      In 2003, plaintiffs and defendants filed their first cross-

15 motions for summary judgment. On March 10, 2004, before the

16 court issued an order on these motions, the case was stayed

17 pending resolution of People v. Cole, 38 Cal. 4th 964 (2006).

18 This court then granted plaintiffs' motion for summary judgment

19 and denied defendants' motion on the ground that "the challenged

20 laws substantially effect and discriminate against interstate

21 commerce and therefore are subject to strict scrutiny under the

22 dormant Commerce Clause." Nat'l Ass'n of Optometrists &

23 Opticians v. Lockyer ("Lockyer"), 463 F. Supp. 2d 1116, 1138

24 (E.D. Cal. 2006). This court continued to hold that, "Although

25 California has legitimate interests in regulating the provision

26 of health services, defendants have failed to meet [their]

3

1  burden of showing that [they have] no other means to advance

2  [their] interests." Id. As such, this court concluded that the

3  laws and regulations violate the dormant Commerce Clause.

4      Defendants appealed. On May 28, 2009, the Ninth Circuit

5  reversed this court's decision and remanded the case for the

6  court to conduct the Pike v. Bruce Church, Inc., 397 U.S. 137,

7  142 (1970), balancing test. Nat'l Ass'n of Optometrists &

8  Opticians v. Brown ("Brown"), 567 F.3d 521, 528 (9th Cir. 2009).

9  The Ninth Circuit held that the challenged laws and regulations

10 are not discriminatory under the dormant Commerce Clause because

11 opticians, including optical chains like LensCrafters, are not

12 similarly situated to optometrists and ophthalmologists.

13     The Ninth Circuit first concluded that "the dormant

14 Commerce Clause is applicable to this case because the retail

15 sale of eyewear involves and affects interstate commerce such

16 that Congress could regulate in that area." Id. at 524. The

17 court continued, however, to reverse this court's ruling that

18 the laws and regulations were discriminatory. Specifically, the

19 court reversed this court's ruling (based upon the statement of

20 the chief sponsor of the challenged provisions) that the

21 regulatory scheme was intended as economic protectionism

22 favoring California business. Id. at 525. Rather, the Ninth

23 Circuit decided that, "[T]he statement is clear that the

24 sponsor's objective was to protect California's optometric

25 profession from being taken over by large business interests, as

26 had been experienced in eastern states." Id. Thus, the Ninth

1  Circuit held that the challenged provisions did not have a
2  discriminatory purpose.

3      The Circuit then looked to whether the laws and regulations
4  had a discriminatory effect on interstate commerce. This
5  question turned on the definition of similarly situated
6  entities. Plaintiffs argued, and this court held, that
7  optometrists and ophthalmologists were similarly situated to
8  opticians, including optical chains, because they "compete in
9  the same market, with the same produces, for the same
10 customers." Lockyer, 463 F. Supp. 2d at 1129. The Ninth Circuit,
11 however, decided that optometrists and ophthalmologists are not
12 similarly situated with opticians. That court held that, "As
13 health care providers, optometrists and ophthalmologists clearly
14 have special responsibilities that opticians do not, and as
15 commercial concerns, opticians have business structures
16 available to them that optometrists and ophthalmologists do
17 not." Brown, 567 F.3d at 527.

18     The Court of Appeals continued to apply Exxon Corp. v.
19 Governor of Maryland, 437 U.S. 117, 125-26 (1978), to conclude
20 that optometrists and ophthalmologists are not similarly
21 situated to opticians. This court previously held that Exxon "is
22 clearly distinguishable." Lockyer, 463 F. Supp. 2d at 1127.
23 Specifically, this court reasoned,

24         Unlike Exxon, in the instant case, California has
           enacted a statutory scheme which has the practical
25         effect of barring all out-of-state entities from
           offering one-stop shopping, while reserving for the
26         principal in-state competitors the right to provide

                                5

1    the competitive advantage. [¶] In Exxon, the Court
     found that interstate dealers were able to compete in
2    the same manner as in-state service station owners
     under the Maryland law. Only gasoline refiners could
3    no longer compete in the Maryland retail market.
     Unlike the case at bar, in Exxon, other interstate
4    firms could compete in the Maryland market. Under
     these circumstances, the Court held, the dormant
5    Commerce Clause was not violated.

6    Id. The Court of Appeals, however, found that Exxon is

7    controlling here and, as such, optometrists and ophthalmologists

8    are not similarly situated to opticians. The court interpreted

9    Exxon to "distinguish[] between . . . entities based on their

10   business structures, holding that a state may prevent businesses

11   with certain structures or methods of operation from

12   participating in a retail market without violating the dormant

13   Commerce Clause." Brown, 567 F.3d at 527. Accordingly, the Ninth

14   Circuit held, "Because states may legitimately distinguish

15   between business structures in a retail market, a business

16   entity's structure is a material characteristic for determining

17   if entities are similarly situated." Id. The court then applied

18   Exxon to "reject LensCrafters' argument that competition in the

19   same market renders it similarly situated to optometrists and

20   ophthalmologists." Id. As such, "opticians are not the same as

21   optometrists or ophthalmologists. . . . Because the California

22   laws make no geographical distinctions between similarly

23   situated entities, they are not invalidated by the dormant

24   Commerce Clause." Id. at 527-28.

25       When discussing the government interest in the challenged

26   provisions, this court previously held that, "defendants

                                6

1  fail[ed] to establish that the public's health is in greater

2  danger when receiving care from an optometrist affiliated with a

3  chain as compared to receiving care from a dispensing

4  optometrist" <u>Lockyer</u>, 463 F. Supp. 2d at 1136-37. The Court of

5  Appeals, however, disagreed with this analysis, and stated that

6          Here through the challenged laws, California has
           sought to protect optometrists and ophthalmologists as
7          health care professionals from being affected by
           subtle pressures from commercial interests. The
8          pressures of co-ownership and profit sharing
           prohibited by the statutes are more obvious, but
9          potentially even a landlord-tenant relationship could
           undermine health care quality if the landlord required
10         a certain level of performance to maintain the lease.
           It is true that an optometrist or ophthalmologist
11         would still be bound by professional and ethical
           standards. However, it is the subtle pressure to
12         conform to commercial desires that the statutes seek
           to avoid. These subtle pressures would be difficult to
13         regulate as violations of professional or ethical
           standards. Thus, the California laws in this case are
14         health regulations designed to prevent health care
           providers from being unduly affected by commercial
15         interests. We must give deference to the State's
           choice to protect its citizens in this way.

16

17 <u>Brown</u>, 567 F.3d at 526.[2] Accordingly, the Ninth Circuit

18 disagreed with this court's analysis of the record that "there

19 is no evidence that the practices that defendants complain of

20 actually harm the public's health." <u>Lockyer</u>, 463 F. Supp. 2d at

21 ────────────────

22        [2] The parties dispute whether this court is bound by this
   analysis. While this discussion is dicta, dicta from a higher
23 court, especially when it concerns the case at bar, should not be
   treated lightly, because it serves as a "prophecy of what that
24 Court might hold." <u>See</u> <u>McCalla v. Royal MacCabees Life Ins. Co.</u>,
   369 F.3d 1128, 1131 (9th Cir. 2004) (internal quotes and citations
25 omitted) (holding that court of appeals should not generally
   disregard dicta of the Supreme Court).

26

7

1136. Rather, the Court of Appeals adopted defendant's theory
that commercial optical companies subtly pressure co-locating
optometrists and ophthalmologist to conform their treatment of
patients with commercial goals. Such subtle pressures, if they
exist, are difficult, if not impossible to measure. Nonetheless,
the Circuit held that these pressures may negatively effect the
quality of health care provided by optometrists and
ophthalmologists working within such companies.

At the conclusion of its analysis, the Ninth Circuit noted
that:

> [D]espite LensCrafters' claims that the ability to
> offer one-stop shopping affords a sales advantage to
> optometrists and ophthalmologists, there are other
> sales advantages enjoyed by LensCrafters by virtue of
> their size, such as lower cost purchasing and the
> ability to offer a wider selection of eyewear. It is
> important that LensCrafters is not precluded from
> operating in California, which is the situation for
> out-of-state entities in some dormant Commerce Clause
> cases. LensCrafters is only deprived of one eyewear
> sales method.

Id. at 528.

The court then remanded the case to this court to conduct
the Pike balancing test. Under this test, plaintiffs "bear[] the
burden of proof in establishing the excessive burden [on
interstate commerce] in relation to the local benefits" of the
challenged laws and regulations. Id.

## II. STANDARD

Summary judgment is appropriate when there exists no
genuine issue as to any material fact. Such circumstances
entitle the moving party to judgment as a matter of law. Fed. R.

1  Civ. P. 56(c); <u>see</u> <u>also</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S.

2  144, 157 (1970); <u>Secor Ltd. v. Cetus Corp.</u>, 51 F.3d 848, 853

3  (9th Cir. 1995). Under summary judgment practice, the moving

4  party

> always bears the initial responsibility of informing
> the district court of the basis for its motion, and
> identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if
> any," which it believes demonstrate the absence of a
> genuine issue of material fact.

9  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed.

10  R. Civ. P. 56(c)).

11      If the moving party meets its initial responsibility, the

12  burden then shifts to the opposing party to establish the

13  existence of a genuine issue of material fact. <u>Matsushita Elec.</u>

14  <u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-86 (1986);

15  <u>see</u> <u>also</u> <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S.

16  253, 288-89 (1968); <u>Secor Ltd.</u>, 51 F.3d at 853. In doing so, the

17  opposing party may not rely upon the denials of its pleadings,

18  but must tender evidence of specific facts in the form of

19  affidavits and/or other admissible materials in support of its

20  contention that the dispute exists. Fed. R. Civ. P. 56(e); <u>see</u>

21  <u>also</u> <u>First Nat'l Bank</u>, 391 U.S. at 289. In evaluating the

22  evidence, the court draws all reasonable inferences from the

23  facts before it in favor of the opposing party. <u>Matsushita</u>, 475

24  U.S. at 587-88 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S.

25  654, 655 (1962) (<u>per</u> <u>curiam</u>)); <u>County of Tuolumne v. Sonora</u>

26  <u>Cmty. Hosp.</u>, 236 F.3d 1148, 1154 (9th Cir. 2001). Nevertheless,

1  it is the opposing party's obligation to produce a factual

2  predicate as a basis for such inferences. See Richards v.

3  Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). The

4  opposing party "must do more than simply show that there is some

5  metaphysical doubt as to the material facts . . . . Where the

6  record taken as a whole could not lead a rational trier of fact

7  to find for the nonmoving party, there is no 'genuine issue for

8  trial.'"   Matsushita, 475 U.S. at 586-87 (citations omitted).

9                          **III. ANALYSIS**

10       The Ninth Circuit remanded this case to apply the Pike, 397

11  U.S. at 142, balancing test. Brown, 567 F.3d at 529. Under this

12  test, plaintiffs bear the burden of proof in establishing an

13  excessive burden to interstate commerce caused by the challenged

14  laws and regulations in relation to their putative local

15  benefits. Id. at 528. Local laws and regulations are rarely

16  struck down under the Pike test. See, e.g., W. Lynn Creamery,

17  Inc. v. Healy, 512 U.S. 186, 200 (1994) ("Nondiscriminatory

18  measures . . . are generally upheld, in spite of any adverse

19  effects on interstate commerce, in part because the existence of

20  major in-state interests adversely affected is a powerful

21  safeguard against legislative abuse.") (internal quotation

22  omitted); Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 529

23  (1959) ("This is one of those cases – few in number - where

24  local safety measures that are nondiscriminatory place an

25  unconstitutional burden on interstate commerce."). Under the

26  Circuit's previous analysis, plaintiffs here are unable to

demonstrate any burden to interstate commerce, let alone an excessive one. Further, the Court of Appeals has held that the challenged provisions serve local interests as " health regulations [that are] designed to prevent health care providers from being unduly affected by commercial interests." <u>Brown</u>, 567 F.3d at 526. As such, the laws and regulations at issue do not excessively burden interstate commerce in relation to their local benefits. Accordingly, plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment is granted.

Plaintiffs raise two arguments as to how the challenged provisions burden interstate commerce. First, they argue that they burden interstate commerce by restricting access to local markets by out-of-state companies. Second, plaintiffs argue that the substantial financial loss that interstate firms will incur under the challenged laws and regulations is so great that it constitutes a burden on interstate commerce. The court need not consider the evidence supporting these theories of burden to interstate commerce because both fail as a matter of law under the Circuit's ruling. Below, each argument will be addressed in turn.

**1.   Restricted Access to Local Markets by Out-of-State Companies.**

Plaintiffs argue that interstate commerce is burdened because there is no way in which an interstate company can offer one-stop shopping. According to plaintiffs, one-stop shopping is

1  the "'dominant form of retailing eyewear' by all eyewear

2  sellers, including dispensing optometrists." Pls. Mot. Summ. J.

3  9. Plaintiffs have presented some surveys that indicate that

4  about 80% of responding consumers purchased their eyeglasses at

5  the same location in which they obtained an eye exam. Id. at 9

6  n.6. Further, they state, the market share of retail chains

7  nationwide in 2001 is 40% and in California in 2003 is 26%.

8  Id. at 9. They indicate that some retail chains decline to enter

9  California at all, and the ones that have entered are "simply

10 disappearing from the market." Id. at 10.

11     Plaintiffs then, in effect, ask this court to disregard the

12 analysis and reasoning of the Ninth Circuit in reversing this

13 very case.  Plaintiffs argue that this court should distinguish

14 the case at bar from Exxon Corp. v. Governor of Maryland, 437

15 U.S. 117 (1978), as it did in its prior order. However, the

16 Ninth Circuit found Exxon binding upon the case and even relied

17 upon Exxon's analysis under Pike in its order. Brown, 567 F.3d

18 at 527 ("[I]n Exxon, the Court distinguished between the

19 entities based on their business structures, holding that a

20 state may prevent businesses with certain structures or methods

21 of operation from participating in a retail market without

22 violating the dormant Commerce Clause."). Accordingly, the court

23 applies Exxon to the case at bar.

24     In Exxon, the Supreme Court considered whether a Maryland

25 statute prohibiting producers or refiners from operating retail

26 services stations within the state violated the dormant Commerce

Clause. 437 U.S. at 119-20. This law was passed following the
1973 shortage of petroleum where evidence indicated that
"gasoline stations operated by producers or refiners had
received preferential treatment during the period of short
supply." Id. at 121. The plaintiff refiners presented evidence
that "their ownership of retail service stations has produced
significant benefits for the consuming public." Id. at 123. They
did not, however, present any evidence "that the total quantity
of petroleum products shipped into Maryland would be affected by
the statute." Id. The refiners also presented evidence that "at
least three refiners will stop selling in Maryland" because of
the law. Id. at 127. After holding that the statute did not
discriminate against interstate commerce because it created "no
barriers whatsoever against interstate independent dealers" or
prohibit the flow of interstate goods, id. at 126, the Supreme
Court evaluated whether the law "impermissibly *burdens*
interstate commerce," id. at 127 (emphasis in original). The
Supreme Court held that the Commerce Clause does not protect
"the particular structure or methods of operation in a retail
market." Id. The court continued,

> [T]he Clause protects the interstate market, not
> particular interstate firms, from prohibitive or
> burdensome regulations. It may be true that the
> consuming public will be injured by the loss of high-
> volume, low-priced stations operated by the
> independent refiners, but . . . that argument relates
> to the wisdom of the statute, not to its burden on
> commerce.

Id. at 127-28. Accordingly, as the Ninth Circuit explained when

1  applying this analysis to the case at bar, "[A] state may

2  prevent businesses with certain structures or methods of

3  operation from participating in a retail market without

4  violating the dormant Commerce Clause." Brown, 567 F.3d at 527

5  (citing Exxon, 437 U.S. at 127.).

6      As the Ninth Circuit stated, California here "merely"

7  prevents opticians to offer one-stop shopping as independent

8  optometrists and ophthalmologists may do. While the challenged

9  provisions may cause consumers to prefer independent

10 optometrists and ophthalmologists to chain optical retailers,

11 "interstate commerce is not subjected to an impermissible burden

12 simply because an otherwise valid regulation causes some

13 business to shift from one [retailer] to another." Exxon, 437

14 U.S. at 127.

15     Given that Exxon is not distinguishable on the grounds

16 reversed by the Ninth Circuit (e.g. that it is impossible for

17 any interstate company to sell eyewear under a one-stop shopping

18 model), plaintiffs seek to distinguish Exxon on the grounds that

19 one-stop shopping is the "dominant" method of doing business,

20 not a mere preferred method of doing business. Plaintiffs,

21 however, provide no authority in support of this theory that

22 prohibiting certain business structures from access to the

23 dominant method of selling eyewear is somehow different from

24 their prohibiting them from the preferred method of selling

25

26

1   eyewear.[3]  This is especially so given that the Court of Appeals

2   specifically questioned the significance of LensCrafters'

3   complaint that "one-stop shopping affords a sales advantage to

4   optometrists and ophthalmologists." Brown, 567 F.3d at 528. The

5   circuit stressed that, "It is important that LensCrafters is not

6   precluded from operating in California . . . . LensCrafters is

7   only deprived on one eyewear sales method." Id. Because

8   LensCrafters is only deprived of a method of doing business, and

9   because the Circuit has clearly held that such a deprivation

10  does not constitute a burden on interstate commerce,  plaintiffs

11  have not shown that interstate commerce is burdened because

12  retail optical chains are unable to offer one-stop shopping in

13  California.

14      When a plaintiff has failed to demonstrate the presence of

15  a burden on interstate commerce, courts need not attempt to

16  balance whether a non-burden is excessively outweighed by the

17  putative local benefits of the law. See Exxon, 437 U.S. at 127-

18  29 (disposing of plaintiffs' dormant Commerce Clause claims by

19  finding that the statute at issue does not burden interstate

20  commerce).

21      Even if plaintiffs had demonstrated a burden to interstate

22  commerce, however, for a court to hold that a facially neutral

23  statute violates the Commerce Clause, "the burdens of the

24  statute must so outweigh the putative benefits as to make the

25

26      [3] Assuming there is a meaningful distinction.

1  statute unreasonable or irrational." <u>Alaska Airlines, Inc. v.</u>

2  <u>City of Long Beach</u>, 951 F.2d 977, 983 (9th Cir. 1991) (holding

3  that district court's close balancing of the burden on

4  interstate commerce with the local benefits of the challenged

5  ordinance was inappropriate). The court continued to hold that a

6  statute is unreasonable or irrational under this test "where the

7  asserted benefits of the statute are in fact illusory or relate

8  to goals that evidence an impermissible favoritism of in-state

9  industry over out-of-state industry." <u>Id.</u> Further, the court

10  reasoned, that a regulation that has "some legitimate

11  justification would easily pass" the <u>Pike</u> test as applied in

12  <u>Raymond Motor Transp., Inc. v. Rice</u>, 434 U.S. 429 (1978)

13  (invalidating statute where the state was unable to offer any

14  evidence that the regulation did anything to advance its argued

15  purpose).[4]

16

17       [4] Plaintiff heavily relies upon <u>Yamaha Motor Corp. v. Jim's</u>
   <u>Motorcycle Inc.</u>, 401 F.3d 560 (4th Cir. 2005). Accordingly,
18  defendants spend significant pages of their briefs distinguishing
   the case. Suffice to say, <u>Yamaha</u> is clearly distinguishable from
19  the case at bar due to the Ninth Circuit's opinion reversing this
   court's prior order. Specifically, in <u>Yamaha</u>, the Fourth Circuit
20  concluded that a challenged law provided no local benefits, and
   thus the difficulty imposed upon out-of-state firms to enter the
21  state market excessively outweighed its local benefits. <u>Id.</u> at 569-
   74. The court reasoned that there were no local benefits because
22  the state had another law that served the same purpose, but did not
   burden interstate commerce to nearly the same extent. <u>Id.</u> Because
23  the challenged law did not provide any benefit beyond the other
   law, the challenged law served no local benefit. <u>Id.</u> Here, however,
24  the Ninth Circuit reasoned that the challenged provisions serves
   a purpose of avoiding the subtle pressures upon health
25  professionals to conform with corporate interests to the detriment
   of the health of their patients. Given this distinction, <u>Yamaha</u>
26  does not provide persuasive guidance to the case at bar.

1    In the instant case, the Ninth Circuit found that the

2  benefits of the challenged laws and regulations are not illusory

3  and do not evidence impermissible favoritism when it reasoned

4  that the provisions serve to protect consumer health by

5  preventing optical companies from exerting "subtle pressures"

6  upon optometrists and ophthalmologists. Brown, 567 F.3d at 526.

7  Given that plaintiffs have not shown any burden on interstate

8  commerce, and even if they did, that the burden must be so

9  extreme as to make the statute irrational to invalidate the laws

10 and regulation, the challenged provisions are valid under the

11 Pike test as to this theory of burden.

12               **2.   Substantial Financial Loss**

13    Plaintiffs' second argument is that the substantial

14 financial loss that interstate firms will incur under the

15 challenged laws and regulations is so great that it constitutes

16 a burden on interstate commerce. In support of this argument,

17 however, plaintiffs only present evidence of the predicted loss

18 in revenue plaintiff LensCrafters will incur if it is "required

19 to forgo the sale of eyewear at the same location where eye

20 exams are provided." Pls. Mot. Summ. J. 11. The amount is

21 substantial.[5] Whether LensCrafters' loss of profits constitutes

22 a burden on interstate commerce requires resolution of a tension

23 between Pike and Exxon. Specifically, in Pike, which was decided

24

25         [5] Pursuant to the tentative sealing orders in this case, the
   court omits the specific amount of revenues LensCrafters estimates
26 it will lose.

1   in 1970, the Supreme Court held that interstate commerce was

2   burdened based upon an individual firm's financial loss due to

3   the regulation. 397 U.S. 137, 145 (1970). Eight years later,

4   however, the Court held in <u>Exxon</u> that the Commerce Clause

5   "protects the interstate market, not particular interstate

6   firms, from prohibitive or burdensome regulations." 437 U.S. 11,

7   127-28 (1978).

8        Plaintiffs refer the court to <u>Pioneer Military Lending v.</u>

9   <u>Manning</u>, 2 F.3d 280 (8th Cir. 1993), which addresses this

10  tension and upon which this court has previously relied in a

11  previous case in granting a preliminary injunction, <u>Pioneer</u>

12  <u>Military Lending v. DuFauchard</u>, No. Civ. S-06-1445 LKK/PAN, 2006

13  WL 2053486, 2006 U.S. Dist. LEXIS 53973 (E.D. Cal. July 21,

14  2006). In <u>Manning</u>, the Eighth Circuit held that, "<u>Exxon</u> neither

15  overruled <u>Pike</u>, nor made irrelevant the burden that a state

16  regulation places on an individual business." 2 F.3d at 283.

17  Rather, <u>Exxon</u> "emphasizes that the burden placed on any

18  individual firm should be regarded in the context of the overall

19  interstate market." <u>Id.</u> Both <u>Manning</u> and <u>DuFauchard</u> concern

20  state regulations preventing the lender plaintiff from making

21  small loans to non-resident military borrowers. In <u>Manning</u>, the

22  court described plaintiff as a Nebraska company who adheres to

23  Nebraska laws when loaning funds to non-resident military

24  borrowers in Missouri. <u>Id.</u> at 281. The court then adopted the

25  district court's finding that the volume of plaintiff's business

26  in Missouri was not large enough for it to maintain a profitable

18

1  service in the state if forced to comply with the Missouri's

2  regulations. Id. at 282. Essentially, compliance "would have the

3  practical effect of closing [plaintiff's] operation in

4  Missouri." Id. The Eighth Circuit then considered the preclusive

5  costs plaintiff would face to do business in Missouri "[i]n the

6  context of the overall market for military loans." Id. at 283-

7  84. Specifically, the court evaluated evidence that plaintiff,

8  while not the only company to provide loans to military

9  personnel in Missouri, "was the only company to provide loans to

10 personnel in the lowest pay grades." Id. at 284. As such, the

11 Eighth Circuit concluded, plaintiff "serviced a unique niche in

12 the market and that the imposition of Missouri's regulations

13 would force [plaintiff] to discontinue its operation, thereby

14 leaving a gap where that niche existed." Id.

15     The court then assessed the local benefits of these

16 regulations. Missouri argued that the state had "an interest (1)

17 in protecting its residents from usurious interest rates and

18 oppressive lending practices; (2) in protecting its reputation

19 as a state which provides equal protection; and (3) in

20 preventing [plaintiff] from obtaining a competitive advantage

21 over other companies making loans to military personnel." Id. at

22 284. The Eighth Circuit, however, found these interests to be

23 weak. Specifically, as to the first interest, only non-residents

24 can obtain loans form plaintiff, so the regulations do not

25 protect residents. Id. As to the second interest, the court

26 adopted the district court's factual finding that there was no

evidence that Missouri's reputation would be harmed by
plaintiff's activities. Id. As to the final interest, the court
concluded that "[t]he interest of Missouri in preventing this
non-resident loan company from obtaining a competitive advantage
is slight on the record presented." Id. at 285. Considering the
significant burden to interstate commerce and the minimal local
interest, the Eighth Circuit held that the regulations, as
applied to plaintiff, violated the dormant Commerce Clause.

Here, plaintiffs have presented evidence that LensCrafters
will lose a substantial amount of profits due to California's
regulations preventing it from operating one-stop shopping
retail stores in the state. Plaintiffs do not, however, present
any evidence as to how this loss of profits burdens interstate
commerce. California consumers are not in any way barred from
purchasing eyewear from LensCrafters. Further, there is no
evidence that California consumers, or a class of California
consumers, will purchase less or no eyewear because of the
regulations. Plaintiffs also argue that the burden on interstate
commerce becomes apparent when considering the impact the
regulations would have upon retail chains if every state were to
adopt them. This argument is similarly without weight because
plaintiffs have not shown that these regulations are a burden to
interstate commerce, but rather that they inhibit the business
model plaintiffs find to be most profitable.

Even if this court were to find that plaintiffs' loss of
profits constitutes a burden on interstate commerce, the local

1  benefits of the challenged provisions are said to be more

2  substantial than those in Manning. As discussed above, the

3  statutes and regulations at issue here are said to serve a

4  legitimate government purpose of preventing optometrists and

5  ophthalmologists from the subtle pressures exerted by optical

6  companies and, as such, they serve the goal of achieving a

7  higher level of consumer health care in California. Again, the

8  court balances a minimal, if any, burden on interstate commerce

9  against a significant local interest, and finds that the burdens

10 do not excessively outweigh the local benefit.

11      Thus, plaintiffs' motion for summary judgment is denied,

12 and defendants' motion for summary judgment is granted.

13                        **IV. CONCLUSION**

14      For the foregoing reasons, plaintiffs' motion for summary

15 judgment, Dkt. No 478, is DENIED and defendants' motion for

16 summary judgment, Dkt. No. 499, is GRANTED.

17      IT IS SO ORDERED.

18      DATED: April 28, 2010.

19

20

21                          LAWRENCE K. KARLTON
                            SENIOR JUDGE
22                          UNITED STATES DISTRICT COURT

23

24

25

26